## PISTON RING CO. v. BURD HIGH COMPRESSION RING CO. et al.

(Circuit Court of Appeals, Seventh Circuit.  April 26, 1921.)

No. 2883.

**Patents ⬅═⇒328—1,050,102, and reissue 14,644, for processes of manufacturing
piston rings, held not infringed.**

The Campbell patent, No. 1,050,102, and Lanchester reissue patent, No.
14,644 (original No. 1,118,784), each for a method of manufacturing piston
rings, *held* not infringed.

Appeal from the District Court of the United States for the Eastern
Division of the Northern District of Illinois.

Suit in equity by the Piston Ring Company against the Burd High
Compression Ring Company and the Liberty Foundries Company.  De-
cree for defendants, and complainant appeals.  Affirmed.

The following is the opinion of Geiger, District Judge:

This case arises out of the Campbell patent, No. 1,050,102, issued January
14, 1913, upon an application filed March 7, 1912, and the Lanchester reissue
patent, No. 14,644, dated May 6, 1919, the original being No. 1,118,784, dated
November 24, 1914, upon an application filed February 7, 1910.  Such patents
deal with the art or method of manufacturing piston rings, though the Lan-
chester reissue aims to cover the product as well.  Campbell states the sub-
ject-matter and object of his disclosure as follows:

"My invention relates to improvements in the art of manufacturing piston
rings and like devices.

"The object of my invention is to provide means for producing a perfectly
circular ring when finished and to provide an improved method of producing
piston rings hereinafter more fully described and particularly pointed out in
the claims.

"Heretofore it has been customary to produce a ring of somewhat greater
diameter than the bore of the cylinder in which it is to be operated, then re-
move a portion of the ring at one side whereby the ring can be compressed into
a less circumference or diameter and inserted in the cylinder, and by its
resilience to yieldably engage the inner surface of the cylinder.

"This compressing of a normally circular ring distorts the same from a true
circle and results in an imperfect fit in the cylinder.  In attempting to obvi-
ate this difficulty, it has also been tried to make the ring with its inner surface
excentric to its outer surface, the removed portion being taken from the thin-
nest part of the ring, whereby the ring when compressed remains more nearly
circular.  This, however, is not entirely successful and is also objectionable
for the reason that the plane opposite surfaces of the ring are greater at
one side than at the other, whereby it wears uneven, and also leaves a clear-
ance between the thin side of the ring and the bottom of the channel of the
piston in which the ring is held.

"My invention consists essentially of a novel method of manufacturing rings
consisting of making a ring pattern of substantially the dimensions of the
ring to be produced with the usual allowance for shrinkage and finishing
and preferable concentric within and without; inserting in one side of this

*pattern a segment of substantially the extent of the portion of the ring to be removed to provide for resilience and compression of the same; casting from this modified pattern; removing a portion of the casting substantially corresponding with the segment inserted in the pattern; compressing the casting to close the opening formed therein, and while so compressed, finishing the ring as preferred, as will more fully appear by reference to the accompanying drawings.  \* \* \*"*

The patentee then elaborated with six figures as follows: and says that figure 1 represented the original pattern; 2 the opening, after being cut and expanded; 3 the segment or gap piece; 4 the casting made from a pattern; 5 the opening formed in the pattern by removal of a segment corresponding to 3; whereas 6 shows the compressed casting. The patentee further calls attention to these figures by noting that when the pattern is originally severed and expanded to receive the segment, it is thrown out of true "round," the degree depending upon the length of the expansion and the introduced segment, and that the casting made from such pattern will, after removal of a segment or gap, in like manner remain out of round. (See figures 2, 3, 4 and 5.) And he adds that "the casting will obviously be restored in a true circle when compressed to the same extent that the pattern was expanded, and thus be a perfect fit within the cylinder."

Upon this disclosure two claims were allowed, namely:

"1. The art of making piston rings and the like, comprising inserting a segment in a circular pattern, whereby the pattern is distorted from a true circular form, casting from said pattern, removing from said casting a portion substantially corresponding to the inserted segment in the pattern, compressing the casting to close the opening therein, and finishing the casting to the working size while in the said compressed condition.

"2. The art of making piston rings and the like, comprising forming a pattern to the working size and shape of the proposed ring with only shrinkage and finishing material added; inserting a segment in said pattern to expand and distort the pattern out of a true circular form, casting from said pattern a ring distorted to expand in the distortion of the pattern; removing from the casting a portion substantially corresponding to the segment inserted in the pattern, compressing the ring to close the opening formed by said removal and to remove the distortion therefrom, and finishing the ring to the working size and shape while thus compressed.

The Lanchester reissue patent, concededly covering the same subject-matter, is discussed by the patentee in the following language:

"The usual method of manufacturing such spring piston rings is broadly to take rings of metal of suitable width, cut out a portion of the circumference of the ring, compress the ring until the ends of the gap abut and turn or scrape the outside of the noncircular ring to circular form. It will be seen that this method involves at least three steps, thus: Initial turning of the ring, cutting the gap, and final turning or fitting. Now, it is found in practice that rings manufactured as above suffer from the defect that the pressure exerted by the ring against the cylinder in which it works is not uniform all around its circumference, and further that it requires much skill on the part of the mechanic and the expenditure of considerable time, to obtain a satisfactory fit of such rings in their working cylinders.

"The object of the present invention is to reduce the number of processes required in the production of spring piston rings and to obtain a high degree of accuracy without the employment of hand-fitting.

"The present invention consists in a method of manufacturing spring piston rings which includes the use of a former of such a noncircular figure, that a ring blank shaped from it, when reduced in circumferential extent by the removal of a portion of the circumference, becomes on compression a circular ring of the required finished size.

"The present invention also consists in a method of manufacturing spring piston rings which includes the use of a former having the noncircular figure obtained by cutting radially a circular ring, inserting a spacing piece in the cut to expand the ring.

"The present invention also consists in the method of manufacturing spring piston rings which includes the use of a former composed of a circular ring, this ring being cut radially, at one place and spring (sprung) open by a spacing inserted in the cut."

The method claims patented by Lanchester, two in number, are:

"1. A method of manufacturing spring piston rings consisting in making a former of circular form of the finished size of the piston ring, cutting such former in one place, holding such former open to a noncircular form by means of a gap piece, reproducing said noncircular form in metal and cutting a piece out of said metal ring of equal length to said gap piece as set forth."

Notwithstanding all testimony taken in the case, it is conceded that the alleged infringing method or process employed by the defendant is accurately set forth in the following answer to an interrogatory, a part of the record of the case:

"A brass drum is cast and turned of such diameter that its exterior circumferential length equals the length of the inner circumference of the cylinder plus the length of the metal excised when the piston ring formed from the pattern is split, plus such allowances as have to be made for shrinkage and finishing. It is then bored and a ring of the required width cut off to form the pattern. The pattern ring is then bent by hand to a generally slight elliptical shape. A test casting is then made from this pattern of the metal of which the rings are to be made. It is split at the point relative to the eccentricity of the ring where the piston rings to be manufactured from the pattern are to be split, and it is compressed by even pressure throughout its periphery to the diameter of the cylinder with which the rings are to be used, allowance being made for the stock to be removed in finishing. The outside periphery and sides are then ground to finished dimensions. A circular template is then used to determine how far out of round the test casting is when so finished and compressed. The amount of error in the casting and its location is noted and the pattern bent to correct the error. New test castings are made and this process of testing and correcting followed until castings of sufficiently correct shape are obtained."

In determining the question of infringement, the foregoing résumé of the specifications and claims of the two patents and of the method employed by the defendant suggests—and this suggestion is conclusively supported by reference to the other matters of record in this case—that certain steps in the making of piston rings are of quite ancient recognition of the art. Lanchester observes that broadly the usual method of making "spring piston rings" is to cut out a portion of the circumference, compress the ring until the ends abut, and "turn or scrape the outside of the noncircular ring to the circular form." This, so he says, involves at least three steps, initial turning of the ring, cutting the gap and final turning or fitting. The defect arising out of this method is unequal pressure in the circumference and a disadvantage in the requirement of "much skill on the part of the mechanic and the expenditure of considerable time to obtain a satisfactory fit of such rings in their working cylinders." His invention aims "to reduce the number of processes and by the use of a former of such a noncircular figure" that by removal of a gap piece it becomes on compression a true ring.

Campbell apparently sought to build upon an art wherein "it has been customary to produce a ring of somewhat greater diameter than the bore of the cylinder, * * * then remove a portion of the ring at one side, whereby the ring can be compressed into less circumference or diameter. * * *"

He observes that this process results in reducing a normally circular ring from its true circule resulting in imperfect fit, uneven pressure, and uneven wearing.

Now, if a comparison be made between the methods suggested by either Lanchester or Campbell and the method pursued by the defendant, the outstanding and initial distinction arises from the recourse by the defendant to the recognized initial step of the prior art, namely, the taking of a ring larger than the cylinder bore; and unless Campbell and Lanchester obtained a monopoly upon their introduction of the "out of round step," unless the defend-

ant is precluded from resorting to every method of taking an out of round step simply because Campbell and Lanchester disclosed the particular method of spreading the ring and inserting the gap piece, it cannot be said to infringe because they resort to a distinctive means of taking or producing such "out of round result." · Therefore what breadth must attach to the particular method or step disclosed by Lanchester and Campbell, or either of them, to bring about either the "out of round" pattern or the "out of round" finished ring? It is my judgment that this question is clearly answered upon the record before us in such a way as at least to relieve the defendant from a charge of infringement.

The patents in suit as well as the literature, in evidence, dealing with methods of manufacturing spring piston rings, clearly show that the fundamental difficulty in the art arose out of dealing with the necessity of having a ring which on compression was circular, but which should, when in use, exert substantially equal pressure at every point of the circumference. In other words, the springing should, theoretically, be equal. Now, whatever may be said about this method or the appliances for practicing it, Ramsbottom, in the English patent issued in 1855, pointed out these matters just as clearly as they are found in the patents in suit or in any other literature of the art. The significance of his disclosure resides, not in the particular mechanical appliances used in practicing his method—those may be conceded to be crude and out of date—but he does show the "out of round" step and in language very much like that found in the patents in suit and in subsequent literature discusses the reasons for taking it. He not only perceived the necessity of taking the step, but disclosed a method. And it is interesting to note that in literature introduced into the record, e. g., the extract from "The Steam Engine" by Holmes, published in 1893 (see printed record in this case, page 141), the commentator quotes Ramsbottom and apparently aims to reproduce Ramsbottom's disclosure in respect to the "out of round" step. In this connection it is interesting to observe the identity in the figure (see pages 140, 141) and figure 5 of Campbell's patent, both of them disclosing the finished ring uncompressed and "out of round." When, therefore, these features of the art which appear so clearly and without contradiction are pressed, it follows necessarily that whatever credit be given to Lanchester and Campbell they were not in a position of claiming broad novelty because of conception of the "out of round" idea, and its introduction at some point or other as a step in making a spring piston ring. On the contrary, they must be limited to a disclosure of a method involving a step patentably novel over the other methods in the art disclosing application of the identical "out of round" conception. That this was the view taken by the Patent Office upon the original Lanchester application seems quite clear upon consulting the file, wherein appears the insistence upon the part of the examiner that clearance and particularity be required in description and definition of the spreading of the ring and the insertion of the gap piece—the examiner apparently being unwilling that any equivocal term—in short, any term except "gap piece" be used for the purpose of description. In that connection, and after repeated rejections because of the insertion of new matter by the applicant, the examiner, on October 21, 1912, dealt with the whole matter—arising upon the claims 1 and 2—in the following language:

"Claim 1 is objectionable in that it defines the result of the expression 'a noncircular annular figure.' The true invention as attempted to be set forth in this claim would appear to be the *method* of making the particular figure, i. e., the noncircular annular figure.

"Claim 2 is rejected on Bussey of record. This claim is no more than the recitation of an old method of producing a shape from a specifically shaped former. The invention would appear to be in the *method of making the former.*" (Italics ours.)

What has been just noted is further strikingly supported by the file history upon Lanchester's reissue application, when the examiner having observed that the specifications provided as a step in the method of ascertaining the size of the gap, "calculation" as well as experiment, wherefore, the "product

claims" necessarily enabled making the product by a method not involved in the "method claims," and directed the cancellation which was acceded to. This recognition by the examiner is in coincidence with the suggestion contained in the Ramsbottom patent, namely, that although the method described proceeded upon an experimental basis and is sufficiently correct for "practical" purposes, "it may also be determined mathematically so as to be theoretically correct." This brings us to a comparison of what is claimed in the patents in suit as the novel method, and as such the subject-matter of the patent, with the defendant's processes.

Undeniably, the "out of round" idea was old and the question is therefore squarely presented: Did Lanchester or Campbell by obtaining a monopoly upon the method of cutting a gap, inserting a gap piece, thereby producing the "out of round" condition, preclude the defendant from manually pressing a circular ring into slight generally elliptical form. If so, what effect is to be given to the recognized conception of producing an "out of round" shape disclosed by Ramsbottom? Certainly, the step followed by the defendant, when compared with Ramsbottom, is just as distinctive, as a method, as is that pursued by Lanchester or Campbell. If it be true, as the latter seemed to indicate, that their method insures with greater certainty the perfect circular form or compression and greater equality of expansion, it is apparent that the Patent Office conceived its novelty to reside in this, that they took, initially, a ring of the precise diameter of the cylinder, or of the finished ring, spread it by means of a gap piece, for pattern purposes, with the intention of removing from the cast "out of round" ring an equal segment, so that, upon compression, the ring resumes the original perfect circular shape. No matter what confidence the defendant may have in the efficacy of its method, it certainly is sufficiently variant from the particular steps or method described by the patents to suggest that it cannot have the merit of the patent method if the latter has what is claimed for it. That is to say, taking a larger ring, manually pressing it into elliptical form (slight or general) cannot be as certain as the method of inserting a gap piece of predetermined length (either upon experiment or by calculation); and further prosecution by the defendant of its method in cutting out a segment, testing out successive patterns, cutting and trying, is certainly not only at variance with what is claimed by the patentees in respect of their particular method practically insuring certainty of result, but is a recurrence to old art practice. The patents in substance claim that by taking a ring of the exact size, and spreading it, the later removal of the segment from the cast furnishes the condition for return, on compression to the perfect circle; and that, as I understand, embodies the claim of novelty. Therefore the whole matter comes back to a consideration of the possibilities of any breadth of disclosure or claim on the part of Lanchester or Campbell, especially in view of the inherent quality of "out of roundness" in spring piston rings—and that implies the necessity at some stage of manufacture of introducing the conception either in a pattern or in the ring itself—and in further view of the recognition by the patentees themselves of diversity of method. Putting it in another way: If Lanchester and Campbell embody the defendant's process upon the theory of the equivalency, why should not the disclosure of Ramsbottom be entitled to even greater range of equivalency, and therefore dominate and destroy the patents in suit? It is to be noted, of course, that the patents in suit cannot be sustained, indeed it is not attempted, as disclosing novel methods of casting from patterns. Any consideration leads to the peculiar step introduced to accomplish the "out of round" conception or idea in making either the ring or the patern, viz., by the basic splitting of a ring and inserting a gap piece to spread. No consideration can deal with this other than as a different way of accomplishing the same result as was disclosed in 1855. Indeed, it is difficult to avoid the conclusion that in splitting the ring and inserting a gap piece, the "out of round" step is taken in a manner quite equivalent with that of putting weights or subjecting the sides of the ring to a stress which will bring them into a permanent noncircular form—and, apparently, Ramsbottom disclosed this as a method of making either the ring itself or a pattern or former.

The general conclusion seems inescapable that Campbell and Lanchester, jointly or severally, are entitled to no credit save such as may arise upon the effort in disclosure of a new method, which, on the face of their patents and in view of the art, if novel, is limited to a means of accomplishing the "out of round" purpose through a pattern formed by splitting a ring and inserting a gap piece; that defendants' method is entirely distinctive and, in so far as it involves the "out of round" conception at some stage, does not infringe plaintiff's patents.

This interpretation which must be brought to the patents in suit furnishes a sufficient basis for disposing of the case upon the issue of noninfringement. But upon such interpretation, when taken in connection with evidence about to be referred to, the case presents so clearly the question of validity of the patent that it is deemed proper to determine such issue also. There are in evidence copies of what has been referred to as the "German" article, stipulated to have been published in a periodical whose translated title is "Chronicles of the Association of German Engineers," published February 16, 1901, and March 16, 1901, two issues, "Printed publications published in Germany and a printed copy of each of which issues was received and catalogued in the John Crerar Library, Chicago, during the year 1901," and presumably since such time remaining in the files of said library open at all times to the public.

This article is relied upon by the defendant as a foreign publication adequate to defeat the patents in suit. The publication gives it a status as a publication of its subject-matter, and the only question is that respecting effectiveness of the disclosure therein contained. A translation by a skilled engineer was brought into the case, and, after somewhat exhaustive cross-examination of the translator, the correctness of such translation is not open to question.

In my judgment, the significance of the article is twofold:

First. The comprehensiveness of its recognition and discussion of the art, notwithstanding its publication more than nine years before the Lanchester patent was originally applied for, thirteen years before its issue, seventeen years before reissue, eleven years before the Campbell patent was applied for, twelve years before its issue.

Second. Its disclosure of the identical methods claimed in each of the patents in suit.

For the purpose of considering the article, in comparison with the statements contained in the patents in suit with the art as exhibited in the testimony of this case, extended excerpts may be made:

"Very exceptional demands are placed upon the tightness of pistons by the high pressures in the modern gas and steam engines. But although all sorts of varieties of rings have been invented, they were unable to replace the old well-known spring rings made of steel or cast iron. The simple and cheap manufacture, combined with the good behavior in service, assigns to these rings also in the future a most important part among the piston rings, and there exists therefore a well-founded reason to busy ones self more intimately with their calculation, construction and the method of machining them.

"Ordinarily spring rings for a diameter D of a cylinder are produced by first finishing a cylindrical ring for an outside diameter of for inst. $D-D/30$ 3 mm, then cutting a piece out of the circumference of the ring amounting to about $D/10$ then bending it together and then finishing it in its bent condition on the inside and outside. Similar at least sound the instructions, which the designer gives to the shop and the exact procedure is generally left to the latter.

"However, this manufacture is by no means as simple as it might appear from such a short instruction; because it cannot simply be expected that a ring manufactured in such a way, and brought into a corresponding cylinder, would really be perfectly round, i. e., that it would at every point be in contact with the cylindrical surface and still less that it would be so with a uniform surface pressure.

"To attain the latter end, some shops have the custom to give the crude ring castings an oval form, composed approximately of two half circles,

which are removed from each other for a small distance a, thus forming approximately an ellipse with a as the distance between the foci. This elliptical ring is cut open at a terminal point of its smallest diameter and is then treated in a way similar to that above referred to. It approaches already more the condition of equal surface pressure.

"The purpose of the subsequent considerations is now before all to establish the conditions for the original form and for the machining of the piston rings in such a way that the rings, when executed accordingly, will subsequently in the cylinder touch everywhere and with the same predetermined pressure and will therefore justify the expectation of the best possible tightness and an uniform radial wear of themselves and the cylinder. The uniform radial wear of the cylinder is of greatest importance because it permits without difficulty to again obtain a good tightness, if the used rings are exchanged in time against new round ones. One should not rely upon the gradual improvement of tightness of imperfect piston rings by means of the wearing down of such points which in the beginning are along in contact with the cylinder wall. Experience shows that such rings are radially compressed by the rapid increase in pressure in the neighborhood of the dead center positions of the piston, and that they therefore soon lose their elasticity and become unserviceable in all cases where they are not built extraordinarily strong or where the pressure which prevails behind the pistons is not also admitted to underneath the rings, whereby a strong friction and wear would be caused.

"Incidentally in the course of the consideration a method will be found by which the exact form of the rings can be found in a very simple way without any figuring. * * *

"Constructing and Machining Piston Rings of Uniform Thickness. * * *

"For the purpose of machining about 2 to 6 mm. have to be added on the inside and outside to the thickness of the crude ring casting depending on the diameter.

"Theoretically now the machining would best be done by producing the exact inside and outside form of the finished uncompressed ring from the crude piston ring body by means of a lathe built for copying or still better by means of a copying, milling machine because the latter makes better copies on account of the slow advance of the cutter. The ring body is thereby equipped with cast-iron lugs to make it easier secured in place, and it should not be used to the full extent of its height in order to have the best possible homogeneity of material. This method would require before all a very accurate template and for the proper machining of rings of various size a copying milling machine, which would allow with a single template to produce geometrically similar bodies of different size. The individual rings would afterwards be cut off from the ready finished oval cylinder and the correct piece cut out at point 1 of Fig. 5.

"However in case that such a special machine is not available for the finishing of the piston rings, they should be cut off in correct width from the ring body which is cast with the smallest possible additional thickness. When doing this the one front surface of the rings can be correctly machined before cutting a ring off while the second is secured subsequently exactly vertical to the cylindrical surface, if needs be by turning the ring around and reattaching it to the lathe. Thereupon the necessary cuts have to be made at point 1 of Fig. 5, which can be done in the simplest way according to Fig. 7, or according to Fig. 8, in case the rings shall overlap. The rings are now to be pressed together (usually by means of a steel band) and to be machined in the compressed state first inside and then outside. * * *

"From the same line of thought, which has led to equation (62), results also a very simple method by which a sufficiently correct form of the piston ring in the uncompressed state can be obtained in a practical way, without much figuring.

"Namely, if one imagines a closed ring of a thickness h, figured acc. to equation (15) and finished in circular form with the diameter $2 r_a$ of the corresponding cylinder, and cut open at a point 1 1, (the cut having the width of the saw blade) and tangential forces Q (Fig. 9) so attached at the

point of cut, that the ring is bent open, then the originally circular ring will with great approximation now assume the form, which is evolved, when designing the ring by way of marking down the changes of the coordinates of the center line. These forces Q would bend the ends of the ring apart for 2 A/11 T+S. The forces Q can therefore as regards their effect be replaced by bending the ring open and wedging a piece of the length 2 Ay/11+S=/12 to 0/8 between its ends.

"In this way it would be very easy to find the form of the ring for the drawing for the pattern. If it is intended to use the thus bent open ring itself as a pattern, it is at the time of machining the closed ring to its circular form necessary to make and in view of shrinkage appropriate, addition to the inside and outside for the later machining. The piece which is to be inserted is given the same length 2 Ay/11+S and it is perhaps formed so as to overlap for the purpose of riveting it on."

"Rings of smaller diameter must for this machining receive an addition, which is important in proportion to their thickness, and they suffer therefore a considerable strain, when bent together in the crude state. With small diameters therefore attention has to be paid to the correct construction of the ring and the careful manufacture of the pattern and the casting, in order to have the ring assume already an almost perfectly round form, when it is bent together in its crude state.

"Neither would it be recommendable, to finish such a smaller ring completely on the inside and only then to begin the machining of its outer circumference; it is rather more correct, to take off small cuts alternately on the inside and outside. Thus of course the cost of manufacture is increased. * * *

"Cast-iron piston rings of 30mm thickness for a cylinder diameter Da=1000 mm are manufactured by the method formerly described from a pattern, which has been obtained by finishing a cylindrical cast iron ring having proper inside and outside additions (of about 5mm each) cutting it open and inserting a piece of D/9=1000/9—110 length."

Among the striking features of the article, to which particular reference may be made, are recognition of the demands occasioned by modern high pressure gas and steam engines, the necessity for consideration of the "calculation, construction and method of machining them" (piston rings) ; the known practice in the art, adverted to in language quite similar to that contained in Lanchester, Campbell, and other evidence in the case ; his specific consideration of the matter with a view of meeting disadvantags growing out of eccentricities and consequent inequalities of pressure in piston rings; the custom of giving crude ring castings an oval or elliptical form; and, finally, the close appreciation of a problem of accomplishing uniform radial wear of the cylinder, etc.

The importance, and the significance of the author's observations, bear not merely upon their concurrence with what appears in the specifications of the patents in suit and in the art, but because of their coincidence with matters strenuously urged in the hearing of this case as supporting the claim of patentable subject-matter rightfully recognized in the patents in suit.

When, therefore, we find not only concurrence or coincidence of the article with the observations made in this case upon the general art, but also find an exact duplication, as it seems to me, of the conception of the patents in suit, the conclusion that defendants have sustained their contention and have satisfied the terms of the statute is unavoidable. Except for suggestions about to be noted, the plaintiffs, upon the trial, were unable to bring forth anything in the way of criticism of the substantially identical character of the disclosure contained in the article. Reference was made to adjudicated cases wherein the disclosure was characterized as "hidden," or as containing merely "the germ of the idea" found in the later patent, on the strength of which it was ignored. Such observations, however, cannot be applied where, as here, the status of the publication is conceded, and the identity of its subject-matter cannot be denied. As already indicated, the disclosure in this article is just as plain as (though in some respects much more elaborate and highly refinded

than) the patents in suit. In such a case, and where both earlier and later patents go no farther than merely to suggest a method to be worked out "by calculation," is another earlier disclosure to be disparaged because it in fact does work out a method in that way? Are the patents in suit to be given credit because they did not do what Ramsbottom and Lanchester suggested might be done and yet never did; and is the article in question to be disparaged for disclosing a carefully worked out method of calculation? Likewise, when the article discloses in simple and plain terms, the method of spreading a ring, using a gap piece, machining it by copying lathe (compare this part of the article with Lanchester) and, generally, appropriately describing practice, is it to be ignored because in addition thereto it contains much that is addressed to most highly skilled engineers, giving formulæ based upon principles of the calculus, higher mathematics, or analytical mechanics? It may be that shopmen or other lay workers in the art, counsel, and court, might not readily or otherwise, or ever, understand these formulæ, but their presence, in conjunction with a disclosure as simple and as understandable and, therefore, as good, as that contained in the patents in suit, should not operate to the disadvantage of the article under the statute. By way of testing out this suggestion, can it be said, if the German article constituted the specification of a patent issued in 1901, Lanchester or Campbell could have successfully met it as an anticipation or as an insufficient disclosure to defeat their own application: or if, as such, it has been copending with them in the patent office, any distinction upon interference could have been drawn?

Now, if it be urged upon the testimony in this case that speculation may be indulged because the method of spreading a ring and inserting the gap piece took no hold in the art prior to the advent of Lanchester and Campbell, the force of the German article and its clarity as an identical disclosure is not thereby impugned. The fact none the less appears that although Lanchester, Campbell and other workers in the art, either did not see nor act upon the publication, the disclosure was none the less old. And I assume that under the statute there is not reserved to the court the right to inquire into the degree to which the publication—conceded to be a publication under the statute —in truth circulated or was read; nor may the court arbitrarily, and because of the mere lapse of time, ignore it. It is not for the court to say that under the statute the value of a printed publication as a disclosure varies either directly or inversely with its age.

The testimony tending to show the plaintiff's great commercial success in manufacturing and selling piston rings, made according to the patent methods, is not supportive of any issue in the case, when once identity of the disclosure contained in the German article with the patent disclosure must be found. Such finding, being clearly demanded, and not open to doubt, the testimony alluded to can serve no purpose except, possibly, to create a doubt or to offer a basis for conjecture respecting the failure of the art to act upon the earlier disclosure. Such latter course, however, is not permissible, unless, in the absence of such proof, the court can say that a doubt arises and exists with respect to identities. I think the defense of invalidity is sustained; and a decree for defendant may be entered.

Charles K. Gillson and Frank E. Liverance, for appellant.

John B. Macauley, of Chicago, Ill., for appellees.

Before BAKER, ALSCHULER, and EVAN A. EVANS, Circuit Judges.

ALSCHULER, Circuit Judge. The bill alleged infringement by appellee of United States patents, No. 1,050,102, January 14, 1913, to Campbell, and reissue No. 14,644, May 6, 1919, to Lanchester, both for manufacture of cast-metal piston ring packings for steam and internal combustion engine cylinders. Among the defenses interposed were noninfringement and invalidity of patents. The Campbell patent is for

a process of making piston rings or patterns for piston rings by radially splitting the round pattern, spreading apart the severed ends, and inserting a segment in the space, whereby the expanded ring becomes more or less distorted from the true round, and using such expanded and distorted ring as a pattern for casting the rings, which when cast have cut from them a piece corresponding with the inserted segment in the pattern. The casting is then compressed, bringing the ends in contact, and while so held is ground or cut smooth on its outer surface.

Upon being compressed so that the ends practically contact, the ring presumably takes the substantially round form of the original ring of the pattern before it was cut and spread. The ring is sprung into the grooves cut in the piston to receive it, and is then compressed for insertion into the cylinder. The tendency of the ring when within the cylinder being to resume its normal expanded form, it presses against the smooth inner wall of the cylinder, producing, to the extent of the perfect roundness of both cylinder wall and the compressed ring, a substantially tight fit between the two, and thus prevents loss of power through leakage of steam, gas, or oil between cylinder wall and ring.

The fit of the opposite side of the ring against the inner surface of the piston groove need not and cannot be so exact, and this side of the ring may be left without cutting or grinding, which conduces to the desired greater resiliency of the cast ring, as well as to simplicity and cheapness of fabrication.

The Lanchester patent devices sued on are one of its two process claims, and its two product claims, which seem to be for a ring produced through and by means of the process set out in the other claims. But in effect the two patents are so similar as quite irresistibly to invite the conclusion that their coverage is substantially identical.

It is apparent that the nearer true round the compressed metal ring is as it presses against the round inner wall of the cylinder, the better will be the contact and more perfect the fit. Cast iron, which both employ, has long been found to be a desirable metal for such rings. The uncontradicted evidence is that appellee makes its pattern rings by first producing a soft brass round drum of a circumference substantially equal to that of the cylinder wall, making proper allowance for shrinkage and finishing, plus a compression space to be left between the ends of the ring when finished and in normal expansion. This brass drum is bored so that the shell remaining is of the thickness of the rings to be made from it. From this hollow drum there are then cut rings of the width of the finished piston ring, and the round brass ring is then distorted by the skillful operative into somewhat elliptical shape. From this a casting is made, and from the casting there is excised a piece, so that what remains will be substantially the length of the inner circumference of the cylinder. The compressed casting is ground on its outer surface, and a round template of desired size applied to find where it is out of round, and the ring bent accordingly, and further test castings made, until one is cast which on finishing as aforesaid will be sufficiently round for practical purposes, and this is thereupon the pattern for casting the commercial rings.

Leaving the inner surface of the ring unground or uncut (which appellee also does), and thus contributing to the resiliency of the ring, is no part of the claimed novelty. This is but an incident in the manufacture of such rings. There is manifestly no need for close contact between the inner surface of the ring and the adjacent surface of the groove in the piston. There is no frictional contact which would require smoothness of this surface of the ring or the adjacent surface of the groove, and, indeed, the very purpose in having the ring spring-like and expansible forbids its close fit with the inner surface of the groove; for in the original expansion, and surely in its further expansion to take up space caused by wear in cylinder wall, there is necessarily some space between inner surface of the ring and the inner surface of the groove. This quality of increased resilience through leaving the inner surface as it was cast, though much lauded in briefs and arguments of counsel, and mentioned in the descriptive part of the Campbell patent, is not referred to in the claims of either.

Expansible metal piston rings are very old in the steam and gas engine art. They were produced and employed in vast numbers long before the patents in suit, and in great variety have been produced and sold ever since. The art has been long so crowded as scarcely to admit of any advance which is basically broad.

Appellant's large commercial success is urgently pressed in furtherance of the claim for broad interpretation of the patents, as well as in support of their validity. From the record it appears that since their start of about twelve years ago, appellant's business in metal piston rings has grown to be larger than that of any one of its ninety or more competitors in this country, who make metal piston rings. While in cases of doubt commercial success of a patented article may tend strongly to influence conclusions favorable to the patent, we know too well of those many notable instances where rapid and signal commercial success has been achieved through improved business methods, appearance, uniformity, and dependability of product, favorable business connections, or a variety of other causes, all wholly apart from monopolistic grants or advantages, to admit of any general rule that because of the coincidental fact of holding a monopoly, this alone must account for the achievement.

Conceding the claims to the extent of their purport, we are convinced that appellee did not employ the process of the patents, and that its product is not the result of their teachings.

In an opinion by Judge Geiger filed in the District Court about five months prior to the entry therein of the decree, the question of infringement was fully considered, and the conclusion of noninfringement reached. With that conclusion and the cogent reasons therefor, as in such opinion stated, we are in entire accord. This of itself, without regard to the question of validity of the patents, which in the same opinion is exhaustively considered, requires us to affirm the general decree of the District Court dismissing appellant's bill with costs.

Decree affirmed.